SHEPARD v. STATE
2023 OK CR 15
Decided: 09/21/2023
BYRON JAMES SHEPARD, Appellant v. STATE OF OKLAHOMA, Appellee
Cite as: 2023 OK CR 15, __ P.3d __

 

 

O P I N I O N

HUDSON, VICE PRESIDING JUDGE:

¶1 Appellant, Byron James Shepard, was tried by jury in the District Court of Pottawatomie County, Case No. CF-2017-176, and convicted of Count 1: Murder in the First Degree, in violation of (A); Count 2: Knowingly Concealing Stolen Property, in violation of ; and Count 3: Possession of Controlled Dangerous Substance (Methamphetamine), in violation of .

¶2 In a separate sentencing phase, the jury found the existence of four statutory aggravating circumstances. The jury found: 1) the defendant, prior to the murder, was convicted of a felony involving the use or threat of violence to the person; 2) the murder was committed for the purpose of avoiding or preventing a lawful arrest or prosecution; 3) the victim of the murder was a peace officer or guard of an institution under the control of the Department of Corrections, and such person was killed in performance of official duty; and 4) at the present time there exists a probability that the defendant will commit criminal acts of violence that would constitute a continuing threat to society.

¶3 Based on these aggravators, the jury sentenced Appellant to death on Count 1. On Count 2, the jury sentenced Appellant to five years imprisonment plus a $500.00 fine. On Count 3, the jury imposed a sentence of ten years imprisonment plus a $5,000.00 fine.

¶4 The Honorable John G. Canavan, Jr., District Judge, presided at trial and pronounced judgment and sentence in accordance with the jury's verdicts. Judge Canavan ordered the sentences for Counts 2 and 3 to run consecutively each to the other but concurrently with Count 1. Shepard now appeals.

BACKGROUND

¶5 On March 26, 2017, at approximately 11:30 p.m., Tecumseh police officer Justin Terney was fatally shot by Appellant during a traffic stop of a car driven by Brooklyn Williams. The dashcam video from Officer Terney's patrol car was introduced into evidence at Appellant's trial as State's Exhibit 3. This video captured the sights and sounds of the encounter that night between Appellant and Officer Terney.

¶6 The dashcam video shows that Officer Terney first made contact with Williams who was unable to produce a driver's license. When Officer Terney asked Appellant, who was sitting in the front passenger seat, for identification, Appellant said his driver's license was suspended and was confiscated after an arrest several months earlier. Officer Terney requested the name and date of birth for both Williams and Appellant. Williams disclosed her true information. Appellant, by contrast, told the officer his name was "James Bishop" and then provided a false date of birth. Williams said nothing in response to Appellant's lies.

¶7 Before returning to his patrol car, Officer Terney informed Williams that he had stopped her for a defective tag light. Officer Terney said he would return in a moment and then walked back to his patrol unit where he radioed in the information for both subjects. The dispatcher responded that she had a return on Williams's information and that her driver's license was flagged as suspended. The dispatcher got no return on the name and date of birth provided by Appellant.

¶8 Officer Terney returned to the passenger side of the white Buick and asked Appellant to step out of the car. With both men standing outside the car, Officer Terney asked Appellant to again provide his name. Appellant responded that his name was "James Bishop, Jr." Officer Terney radioed the dispatcher to ask her to check the same name only this time adding "Jr." At one point, the officer requested Appellant to remove his hands from his pockets. Appellant complied and indicated that he was only holding a lighter. The dispatcher asked for Appellant's middle name. Appellant responded "Bunyon." Officer Terney laughed, said "Bunyon? Whatever" then gave the name to the dispatcher. Officer Terney said that he thought Appellant was lying to him and asked whether that was the case. Appellant denied lying and responded that was his name. When asked whether the license was issued in Oklahoma, Appellant responded that his license was from Ohio.

¶9 After reporting this information to the dispatcher, Officer Terney stated again that he thought Appellant was lying about his identity. The two men spoke casually while the dispatcher ran the information. At one point, Appellant asked whether Williams would be getting a ticket. Officer Terney responded she would be receiving a ticket at the least. Appellant told Officer Terney he was arrested in Columbus, Ohio, and had only been living in Oklahoma two months. When the dispatcher responded over the radio that the only man with the name given was born in 1939, Appellant claimed that was his father. He also offered they should "check again." Officer Terney responded that he needed something with Appellant's name on it for identification.

¶10 As these events unfolded, Lieutenant Michael Mallinson of the Tecumseh Police Department was on patrol a few miles away with new officer trainee Alana Colan. Lt. Mallinson monitored the radio traffic for the stop and responded to Officer Terney's location to provide backup. Lt. Mallinson was concerned the male subject in Officer Terney's traffic stop was providing false information. When Lt. Mallinson and Officer Colan arrived on the scene, Williams was still seated in the driver's seat of the white Buick and Appellant was standing outside the passenger side of the car with his hands on the rolled down passenger window. Officer Terney was standing a few feet away from Appellant.

¶11 The dashcam video next shows Appellant leaning down to the passenger window and asking Williams whether she had anything in the car with his name on it. As if to foreshadow his next move, Appellant raised his head twice while talking to Williams and looked across the road in the direction of the tree line. Shortly after Lt. Mallinson's patrol unit came to a full stop behind Officer Terney's vehicle, and after Officer Terney again asked whether Appellant was lying to him about his identity, Appellant took off running across the road, into the tree line and underbrush separating the roadway from an adjacent field.

¶12 Officer Terney gave chase while yelling at Appellant to stop and warning that Appellant was about to be tased. Officer Terney's flashlight can be seen on the video, in the tree line just off the side of the road, as he deployed his taser and warned that he would tase Appellant again. When Officer Terney's flashlight moves out of camera range, the sounds of the dashcam's audio reveal what happened next. A distinctive metallic clicking sound resembling a gun being racked precedes the sound of Officer Terney yelling at Appellant to get on the ground. Seconds later, multiple gunshots were fired and sustained screams from both men can be heard on the recording. Officer Terney reported over the radio that he had "been hit" in the leg and had "been shot".

¶13 Lt. Mallinson got caught in the top rung of a barbed wire fence separating the field from the road and he had to pull himself off the fence. Free of the wire, Lt. Mallinson made his way through the dense underbrush. Before he could exit the tree line, however, the gunfire erupted. Lt. Mallinson called out to Officer Terney and located him in the darkness, lying on the ground with his head resting on a round hay bale in the middle of the large, open field. Appellant was on the ground, roughly four feet away by Lt. Mallinson's recollection, screaming and moaning in pain. Appellant's body was positioned facing Officer Terney.

¶14 Lt. Mallinson can be heard on the dashcam video ordering Appellant repeatedly to show his hands. When Lt. Mallinson asked Officer Terney whether Appellant had a gun, Terney confirmed that Appellant had a gun and had shot him in the leg. A Springfield XD 9mm semiautomatic pistol was on the ground just a few feet from Appellant. This gun was the one used by Appellant to kill Officer Terney. DNA analysis of swabbings taken from the backstrap, grip and trigger of the 9mm pistol confirmed the presence of male-specific YSTR DNA that matched Appellant's known DNA profile, meaning that Appellant and all of his male blood relatives could not be excluded as a potential source of this DNA.

¶15 Lt. Mallinson kicked away the gun and held Appellant at gunpoint while backup officers from surrounding agencies responded to the scene. Officer Terney's Glock 22, .40 caliber semiautomatic pistol was recovered nearby. A short time later, Officer Terney said "Mike, I'm fixing to pass out man." Lt. Mallinson told Terney to "stay with me, brother."

¶16 Lt. Mallinson asked Officer Terney whether he got any shots off. Terney responded "Yeah, I shot him." Lt. Mallinson can also be heard on the video yelling more directions at Appellant to show his hands and stay down. Appellant continued to holler and complain that he "can't breathe". Officer Terney, who by this point was nonresponsive and becoming paler by the minute, had suffered a gunshot wound to the right lower abdomen and to the right thigh. Appellant too was shot several times, including in the scrotum, chest, hand and arm. All of Appellant's gunshot wounds were to the front of his body; none of the gunshot wounds were to Appellant's backside. The gunshot wounds to Appellant's chest/rib cage area and arm were located on the left side of his body which is significant because Appellant is left-handed. When an officer rolled Appellant over to look for injuries, two taser probes were still attached to the blue jeans over Appellant's right buttock, with an insufficient distance between the probes to be incapacitating when the taser probes made contact.

¶17 Both men were transported to OU Medical Center for emergency treatment. Appellant survived. Officer Terney, age 22, died from his injuries. Dr. Eric Pfeiffer, the state's chief medical examiner, observed two separate areas of gunshot injury for Terney. First, a perforating (through-and-through) gunshot wound was observed on the victim's right thigh. Second, a gunshot wound to the victim's lower right abdomen, just above the hip, was also observed and was the cause of death. There was no exit wound for this gunshot injury. The bullet penetrated Terney's handcuff case and duty belt, then entered just below his Kevlar vest. The bullet severed Terney's iliac vein and lodged in his left hip. Terney ultimately bled to death due to this injury. The bullet that caused this injury was recovered internally from Officer Terney's left hip.

¶18 At the crime scene, investigators found the blast doors for the victim's taser in the dense undergrowth of the tree line, near the roadway. The blast doors fall away when the taser is deployed by pulling the trigger and allows the probes and their wires to deploy. Roughly sixty yards away, in the vast open field, investigators recovered spent shell casings, and a projectile, in the area near two round hay bales where Officer Terney and Appellant were found. Four .40 caliber shell casings, two 9mm shell casings and a fired projectile that was consistent with a .40 caliber cartridge were recovered in this area. A photograph of this area showed the .40 caliber shell casings were found a short distance away from the 9mm shell casings, on opposite sides of each other. The projectile was found face-down in the dirt near the 9mm shell casings. No shell casings or projectiles were found anywhere beyond this area of the round hay bales.

¶19 Examination and comparison by OSBI ballistics examiner Terrance Higgs revealed the .40 caliber shell casings were fired from Officer Terney's Glock 22, .40 caliber semiautomatic pistol. The 9mm shell casings were fired from Appellant's Springfield XD 9mm semiautomatic pistol. According to Higgs, the size and weight configuration of the bullet recovered during the autopsy from Officer Terney's left hip was consistent with a 9mm projectile. The projectile found face-down in the dirt was a jacket hollow point bullet that was not fired by the 9mm pistol but instead was consistent with a .40 caliber bullet fired from Officer Terney's gun.

¶20 The murder weapon had been stolen from the Tulsa residence of Phillip Pfanstiel in July 2016. On the stand, Pfanstiel matched the serial number on the gun with the serial number from the box of his missing pistol. Pfanstiel does not know Appellant and testified there was no reason for Appellant to have been in possession of his firearm at the time of Officer Terney's murder. Pfanstiel did not ever give Appellant permission to have his gun. The gun turned up missing after Pfanstiel's niece and her boyfriend (who was not Appellant) did some landscaping at his home while Pfanstiel was away. Pfanstiel immediately reported it stolen but the gun was never recovered by the police until Appellant shot and killed Officer Terney.

¶21 When the paramedics cut off Appellant's clothes to look for injuries, Officer Jaime Breedlove recovered from Appellant's person a cell phone, a glass pipe containing burnt methamphetamine residue, a lighter and a plastic bag inside a cigarette box filled with 8.5 grams (gross weight) of methamphetamine. A cell phone for Williams was recovered from inside the white Buick and was also taken into evidence. Police executed a search warrant for Appellant's truck found parked in front of Williams's house. Inside, police found another cell phone belonging to Appellant, thirteen rounds of 9mm ammunition loaded inside a .40 caliber Springfield XD magazine, recent fast-food receipts, clothes, a billfold and two glass pipes.

¶22 Investigators soon discovered Appellant's real identity was Byron James Shepard. Appellant was a known fugitive with an active arrest warrant from Okfuskee County for the crime of knowingly concealing stolen property. Investigators with the District 23 Task Force had searched unsuccessfully for Appellant at a residence in Pottawatomie County associated with Brooklyn Williams on March 15, 2017, and again on March 22, 2017. Text messages exchanged between Appellant's and Williams's cell phones in the days and hours leading up to the murder reveal not only an awareness that local police were actively searching for Appellant, but an effort to avoid arrest altogether. Some of the text messages also reveal Appellant's volatile personality and potential for violence on the day of the murder.

¶23 On March 19, 2017, Williams's phone sent a message to Appellant's phone indicating that one of the police officers looking for Appellant lived down the street, "[s]o I might get a ride somewhere before I met [sic] you just in case they follow." During another exchange about his stolen welding truck, Appellant texted "[t]hey made one mistake LOL. Push me too far and jail isn't an option. I can't get them all but I promise the first four or five are mine."

¶24 Similar conversations continued the day of the murder. On March 26, 2017, at 1:11 p.m., Williams sent a message to Appellant's phone advising "[t]here is a sheriff at Seminole." A few minutes later, Williams sent two other text messages to Appellant's phone asking why he was not responding and proclaiming "[y]ou're not ever going to learn until they finally get your ass. And when they do, you better not call me[.]" Later, at around 1:30 p.m., after receiving a text message from Appellant's phone that said "[h]eaded back west[,]" Williams replied that "I hate you coming this way. It scars [sic] me right now." Williams also asked in another text, time stamped at 1:33 p.m., why Appellant could not avoid "risking coming down here[.]"

¶25 Later, at 5:04 p.m., Williams sent Appellant's phone a text message stating, "[t]here was a highway patrol on Highway 9." Just hours before the murder, at 7:52 p.m., a text was sent from Appellant's phone to Williams threatening to "put one between your fucking eyes." Another text message sent from Appellant's phone to Williams at 8:08 p.m. on March 26, 2017, stated Williams was "lucky" he loved her son "or I would kill your fucking ass." 

¶26 Finally, the State argued at trial that the metallic clicking sound heard on the dashcam recording, right before the victim ordered Appellant to get on the ground, was the sound of Appellant racking his gun to chamber a bullet before shooting the victim. Lt. Mallinson testified that police officers are trained and taught to carry their semiautomatic pistol loaded with a round in the chamber, ready to fire while on duty. Consistent with this training, Lt. Mallinson testified that he had never carried his service weapon while on duty without it being chamber loaded. Lt. Mallinson further testified that part of his duties as a field training officer was to ask Officers Terney and Colan before their shift that night whether their firearms were chamber loaded and fully topped off with rounds in the magazine. Lt. Mallinson testified that he would always ask the officers, and tell them, to make sure they had their service weapons at full capacity. Additional facts will be presented below as needed.

ANALYSIS

1. Ineffective Assistance of Counsel--Theory of Defense

¶27 The main issue during the first stage of trial was whether Appellant acted with malice aforethought when he fatally shot Officer Terney. See (A) ("Malice is that deliberate intention unlawfully to take away the life of a human being, which is manifested by external circumstances capable of proof."). In Proposition I, Appellant contends that trial counsel's performance during the guilt-innocence stage of his trial was constitutionally ineffective. Defense counsel argued at trial that it was highly probable that Officer Terney shot himself in the leg, that it was possible that Appellant shot himself through the scrotum and if this was the case, there was no deliberate intent to kill. The defense theory at trial was that a self-inflicted gunshot wound by either Officer Terney or the victim resulted in a reactionary exchange of gunfire given the conditions that night and, thus, there was no malice aforethought.

¶28 Appellant contends on appeal that this theory was definitively contradicted by the available evidence. Appellant tells us the better defense argument was to omit any claim of an accidental shooting and to argue simply that Appellant shot back at Officer Terney in a reactionary manner, in an effort to discourage further pursuit, rather than with deliberate intent to kill the victim. Appellant argues on appeal that the victim's gunshot wounds "appear to be the result of random, blind shooting in the dark, not intent." Appellant argues although "a shooting clearly occurred, the evidence reflects randomness and an attempt to escape rather than malice aforethought[.]" Appellant says trial counsel "torpedoed [his] defense with an illogical and easily disproved theory that the two men shot themselves."

¶29 To prevail on an ineffective assistance of counsel claim, the defendant must show both that counsel's performance was deficient and that the deficient performance prejudiced his defense. Strickland v. Washington, 466 U.S. 668, 687 (1984). As summarized by the Supreme Court:

To establish deficient performance, a person challenging a conviction must show that "counsel's representation fell below an objective standard of reasonableness." 466 U.S. at 688. A court considering a claim of ineffective assistance must apply a "strong presumption" that counsel's representation was within the "wide range" of reasonable professional assistance. Id., at 689. The challenger's burden is to show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Id., at 687.

With respect to prejudice, a challenger must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id., at 694. It is not enough "to show that the errors had some conceivable effect on the outcome of the proceeding." Id., at 693. Counsel's errors must be "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Id., at 687.

Harrington v. Richter, 562 U.S. 86, 104 (2011) (quoting Strickland, supra).

¶30 Appellant fails to show ineffective assistance of counsel based on trial counsel's theory of defense. The nature of the evidence in this case, with the gunshots between Officer Terney and Appellant being exchanged off camera, in the darkness of the large, open field, set the stage for trial counsel's defense theory. There was no video of the shooting itself, and the dashcam audio provides no definitive sequence of the events surrounding the exchange of gunfire between Appellant and Officer Terney.

¶31 Certain aspects of trial counsel's defense theory nonetheless were contradicted by the physical evidence and the dashcam audio. The medical testimony concerning the trajectory of the gunshot wound to Appellant's scrotum, as well as the bullet hole found underneath the groin area, between the legs on the seam of Appellant's jeans, and a matching bullet hole found in Appellant's underwear, was consistent with Officer Terney shooting Appellant between the legs after Appellant fell to the ground.

¶32 The defense claim that Officer Terney shot himself drew support from Dr. Nichols's observation in the autopsy report that the through-and-through gunshot wound to the victim's right thigh consisted of an entrance wound at the top, and an exit wound at the bottom, traveling from back to front. However, Officer Terney stated on the dashcam audio that the suspect shot him in the leg and gave no indication whatsoever that he suffered a self-inflicted gunshot wound. Further, Investigator Holasek found burning to the victim's uniform pants around the bottom bullet hole associated with this gunshot wound. The burn mark was consistent with having been made by the heat of the bullet as it entered Officer Terney's right thigh. The upper bullet hole on Officer Terney's right thigh, by contrast, had no such burning to the uniform pants. This suggested that the entry wound was the lower bullet hole which is inconsistent with a self-inflicted gunshot wound. We observe too that Dr. Pfeiffer, the substitute medical examiner, offered no opinion about the directionality of this particular gunshot wound and emphasized that he did not rely upon Dr. Nichols's report in reaching his own opinions about the case.

¶33 Despite these flaws, the record shows defense counsel made a strategic commitment to arguing that Appellant did not have the intent to kill Officer Terney and to claim the gunfire that resulted was merely reactionary due to an accidental gunshot prompted by the extremely difficult conditions in the field that night. On balance, there is very little difference between this theory and the one now proposed by Appellant on appeal. At trial, defense counsel pursued an accidental shooting theory and attempted to explain away the resulting gunfire as reactionary and void of deliberate intent to kill. On appeal, Appellant says "the evidence reflects randomness and an attempt to escape rather than malice aforethought[.]" Appellate counsel's primary complaint today, however, is that the evidence contradicted defense counsel's claim that either the victim or Appellant shot themselves.

¶34 Assuming arguendo trial counsel's performance was deficient for arguing that either the victim or Appellant could have accidentally shot themselves while in the open field, Appellant fails to show prejudice. See Strickland, 466 U.S at 697 ("If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed.") Appellant fails to establish a reasonable probability of a different outcome at trial had defense counsel urged instead "that [Appellant] shot back at Officer Terney in a reactionary manner and in an effort to discourage further pursuit, rather than a deliberate intent to kill Officer Terney."

¶35 The problem for Appellant is the State's evidence uniformly showed that Appellant, a wanted fugitive, fired two shots at vital areas of Officer Terney's body after Appellant was tased and then ran nearly sixty yards into an open field under the cover of darkness, all in effort to escape arrest on the Okfuskee County felony warrant. The physical evidence showed that the gunshots fired by Appellant and the victim were exchanged across a relatively short distance, in the area near the round hay bales, just as the victim was threatening to apprehend Appellant. Nothing on the dashcam video demonstrates that the gunshots were fired accidentally, randomly or without malice aforethought. Indeed, Officer Terney is heard on the video stating that the suspect shot him in the leg and that he shot the suspect. The State also credibly argued, based on the dashcam recording, that Appellant chambered a round in his gun immediately before the victim started yelling at him to get on the ground--mere seconds before the first gunshots were fired. The text messages exchanged between Appellant and Williams likewise demonstrated Appellant's willingness to kill in order to avoid jail.

¶36 Defense counsel's efforts at trial to convince the jury that Appellant (or the victim) accidentally shot himself, thus sparking a reactionary shootout that did not involve deliberate intent to kill, amounts to pure speculation. The same too can be said for the defense theory now championed on appeal that Appellant was shooting wildly and randomly into the night as mere warning shots to the victim. The physical evidence demonstrated that Appellant and Officer Terney were physically much too close for such a theory to be viable. The mere fact that Appellant opened fire on the victim from a relatively close distance--and struck him with both shots fired--in a continuing effort to escape arrest itself undermines Appellant's claim that he had non-lethal intent. Issues surrounding the darkness and the rainy, muddy conditions faced by both men in the field that night do not negate the evidence in this case showing Appellant was fully aware of the victim's presence near him in the moments before the shooting and that he chambered a round in his gun immediately before opening fire. The text message evidence demonstrating Appellant's volatile personality and potential for violence on the day of the murder likewise undermines an accidental shooting theory. The evidence in this case uniformly shows malice aforethought.

¶37 "A design to effect death [i.e., premeditation] is inferred from the fact of the killing, unless the circumstances raise a reasonable doubt whether such design existed." . "Premeditation sufficient to constitute murder may be formed in an instant or it may be formed instantaneously as the killing is being committed." Davis v. State, , ¶ 76, , 111. At most, Appellant's new theory bolsters the State's proposed motive for why he shot the officer (he did not want to be arrested on the felony warrant) but "does nothing to bolster the inference that appellant acted without a design to effect death." Boyd v. State, , ¶ 10, , 1367. Based on the total circumstances presented, Appellant fails to show Strickland prejudice from defense counsel's theory of defense in the first stage of trial.

¶38 Appellant is also not entitled to an evidentiary hearing based on the non-record materials he presents in support of this claim. At most, these materials reinforce what is already apparent from the record, namely, that trial counsel had limited options in challenging malice aforethought. Appellant fails to show by clear and convincing evidence there is a strong possibility trial counsel was ineffective for failing to utilize or identify the complained-of evidence. Rule 3.11(B)(3)(b)(i), Rules of the Oklahoma Court of Criminal Appeals, Title 22, Ch. 18, App. (2023); Mahdavi v. State, , ¶¶ 46-47, , 460. Proposition I is denied.

2. Lesser Included Offense Instructions

¶39 At trial, Appellant requested lesser included offense instructions on second degree depraved mind murder, second degree felony murder, and first degree misdemeanor manslaughter. After hearing argument from both parties, the trial court denied these requests and provided no lesser included offense instructions. In Propositions II, III and IV, Appellant complains that the trial court's rulings amount to reversible error.

¶40 In Tryon v. State, , , we set forth the governing law for this type of claim:

"This Court has held that it is the duty of the trial court to determine as a matter of law whether the evidence is sufficient to justify the submission of instructions on a lesser included offense. If there is a doubt, the court should submit the matter to the jury." Rumbo v. State, , ¶ 3, , 1132. In a first degree murder case, the trial court should instruct on any lesser form of homicide supported by the evidence. Bland v. State, , ¶ 54, , 719. We require prima facie evidence of the lesser included offense to support giving a lesser included instruction. Davis, , ¶ 101, 268 P.3d at 116. "Prima facie evidence of a lesser included offense is that evidence which would allow a jury rationally to find the accused guilty of the lesser offense and acquit him of the greater." Id.

In capital cases, the Supreme Court has held that a death sentence may not constitutionally be imposed unless the jury is permitted to consider a verdict of guilt as to a lesser-included non-capital offense which is supported by the evidence. Beck v. Alabama, 447 U.S. 625, 633-45 (1980). See Davis, , ¶ 117, 268 P.3d at 119. Beck does not, however, require the trial court to instruct on offenses that are not lesser included offenses of the charged offense under state law. Hopkins v. Reeves, 524 U.S. 88, 90-91 (1998). The Court's "fundamental concern" in Beck "was that a jury convinced that the defendant had committed some violent crime but not convinced that he was guilty of a capital crime might nonetheless vote for a capital conviction if the only alternative was to set the defendant free with no punishment at all." Schad v. Arizona, 501 U.S. 624, 646 (1991).

Tryon, , ¶¶ 66-67, 423 P.2d at 637-38 (parallel citations omitted). 

a) Second Degree Depraved Mind Murder

¶41 In Proposition II, Appellant argues that the evidence supported instruction on the lesser included offense of second degree depraved mind murder. Homicide is murder in the second degree "[w]hen perpetrated by an act imminently dangerous to another person and evincing a depraved mind, regardless of human life, although without any premeditated design to effect the death of any particular individual[.]" (1). "We have held that this statute is applicable where there is no premeditated intent to kill any particular person." Paxton v. State, , ¶ 10, , 1317. "[A] person evinces a 'depraved mind' when he engages in imminently dangerous conduct with contemptuous and reckless disregard of, and in total indifference to, the life and safety of another." Bench v. State, , ¶ 75, , 954 (quoting Instruction No. 4-91, OUJI-CR (2d) (Supp.2000)). One example of this crime is "shooting into a crowd, where one does not intend to kill any particular person, but where death to someone is so probable that the law will infer an intent." Dennis v. State, , ¶ 24, , 95.

¶42 In the present case, there is no evidence showing Appellant acted without a premeditated design to effect the death of any particular individual. The evidence showed that Appellant's actions were directed at a specific individual and that his actions indicated a design to effect the death of one person, namely, the victim. Officer Terney was the only individual pursuing Appellant through the darkness of the open field and was close enough physically, or nearly so, to take Appellant down when the gunfire erupted. The physical evidence showed the gunshots fired by Appellant and the victim were exchanged across a very short distance, in a relatively small area, near the round hay bales.

¶43 There is no question that Officer Terney was threatening to apprehend Appellant when the shots were fired. This after deploying the taser probes into Appellant's right buttock sixty yards back in the tree line, near the road, and engaging in a foot chase across the open field. Nothing about the conditions that night (the darkness, the soft, rain-soaked ground, the uneven terrain) negates the State's evidence that Appellant fired two gunshots at vital areas of Officer Terney's body in an effort to avoid arrest on an active felony warrant by the victim. The physical evidence shows there was nothing random or haphazard about the gunshot wounds inflicted on the victim as suggested by Appellant on appeal. The victim's injuries make clear that Appellant was not blindly shooting into the darkness as now claimed. The text message evidence, like the sound on the dashcam recording of a gun being racked mere seconds before gunshots were fired, also does not support Appellant's request for this instruction. "Nothing in these facts suggests anything but a design to effect the death of one specific person." Charm v. State, , ¶ 10, , 760.

¶44 Appellant's arguments amount to mere speculation that he acted without a design to effect the death of Officer Terney. We require evidence, not speculation, to warrant instruction on a lesser included offense. As discussed in Proposition I, Appellant's theory bolsters the State's proposed motive for why he shot the officer (he did not want to be arrested on the felony warrant) but "does nothing to bolster the inference that appellant acted without a design to effect death." Boyd, , ¶ 10, 839 P.2d at 1367. That is especially so considering that "[p]remeditation sufficient to constitute murder may be formed in an instant or it may be formed instantaneously as the killing is being committed." Davis, , ¶ 76, 268 P.3d at 111.

¶45 All things considered, there was insufficient evidence presented at trial to allow a jury rationally to find the accused guilty of second degree depraved mind murder and acquit him of first degree malice aforethought murder. The trial court did not abuse its discretion in declining an instruction on this lesser included crime. See Davis v. State, , ¶ 7, , 277 (reviewing the trial court's decision on lesser included offense instructions for abuse of discretion). Proposition II is denied.

b) Second Degree Felony Murder

¶46 In Proposition III, Appellant contends that lesser included offense instructions for second degree felony murder, using the underlying felony of knowingly concealing stolen property, should have been given to his jury. See Childress v. State, , ¶ 25, , 1012-13 (lesser offense instructions on second degree felony murder must be given in a first degree murder case if supported by the evidence). Appellant compares his case favorably to that of his co-defendant, Brooklyn Williams, who was convicted of second degree felony murder based on the underlying felony of harboring a fugitive. We previously affirmed Williams's conviction in an unpublished opinion. See Williams v. State, No. F-2019-204 (Okl.Cr. Sept. 2, 2021).

¶47 Homicide is murder in the second degree "[w]hen perpetrated by a person engaged in the commission of any felony other than the unlawful acts set out in" the first degree felony murder statute. (2). The crime of knowingly concealing stolen property is not specifically listed as a qualifying crime in the first degree felony murder statute. (B). Appellant was convicted in Count 2 of knowingly concealing stolen property based on his possession of the murder weapon in this case which was proved at trial to be stolen. Count 2 of the amended Information alleged that Appellant concealed the black Springfield XD 9mm semiautomatic pistol that had been stolen from Phillip Pfanstiel, and that Appellant knew or had reasonable cause to believe the 9mm pistol was stolen.

¶48 The essential elements of the crime of knowingly concealing stolen property are "(1) knowledge that the property was stolen, and (2) an act of concealing it in some manner from its rightful owner." Wyatt v. State, , ¶ 9, , 1133. In Proposition VII, infra, we find that insufficient evidence was presented at trial to support Appellant's Count 2 conviction for knowingly concealing stolen property. Specifically, we find insufficient evidence was presented at trial to establish beyond a reasonable doubt that Appellant knew, or reasonably should have known, that the murder weapon was stolen. There was no evidence in the record demonstrating facts inconsistent with honest possession that supplemented the evidence showing Appellant's possession of the stolen gun. See McMillan v. State, , ¶ 3, , 1275.

¶49 Under these circumstances, there was insufficient prima facie evidence presented at trial to allow a jury rationally to find the accused guilty of second degree felony murder and acquit him of first degree malice aforethought murder. The trial court did not abuse its discretion in declining an instruction on this lesser included crime. Proposition III is denied.

c) First Degree Misdemeanor Manslaughter

¶50 In Proposition IV, Appellant contends that instructions for first degree misdemeanor manslaughter, using the underlying misdemeanor crime of obstruction of justice, should have been given to his jury. Homicide is manslaughter in the first degree "[w]hen perpetrated without a design to effect death by a person while engaged in the commission of a misdemeanor." (1); Polk v. State, , ¶ 17, , 111. This statute "does not distinguish among the type or category of misdemeanor which can be used as the underlying offense in a misdemeanor manslaughter charge." State v. Ceasar, , ¶ 7, , 794. However, absent evidence the homicide was perpetrated without a design to effect death, an instruction on this lesser included offense is unwarranted. In the present case, there is no such evidence.

¶51 As discussed above, the evidence showed that Officer Terney was only a short distance away, and threatening to apprehend Appellant, when Appellant fired two gunshots from a semiautomatic pistol at vital areas of Officer Terney's body to avoid arrest on an active felony warrant. Appellant's statements in the text messages about his willingness to kill to avoid jail, like the sound of the gun racking in the dashcam recording, does not support Appellant's claim of no premeditation to kill. There was nothing random or haphazard about the gunshot wounds inflicted on the victim as suggested by Appellant on appeal. Instead, the evidence uniformly showed Appellant acted with a design to effect the death of Officer Terney. Under these circumstances, a rational juror could not find that the homicide was perpetrated without a design to effect death. There was thus insufficient prima facie evidence presented at trial to allow a jury rationally to find Appellant guilty of first degree misdemeanor manslaughter and acquit him of first degree malice aforethought murder. The trial court did not abuse its discretion in denying instructions on this lesser crime. Proposition IV is denied.

3. Change of Venue

¶52 In Proposition V, Appellant complains that the trial court erred when it denied his pretrial request for a change of venue. He argues that this action denied him his right to an impartial jury and a fundamentally fair trial. Appellant preserved this claim for appellate review when he renewed his pretrial request for a change of venue during voir dire.

¶53 Both the Sixth Amendment and the due process requirements of the Constitution protect a criminally accused's right to a "fair trial by a panel of impartial, 'indifferent' jurors." DeRosa v. State, , ¶ 17, , 1134 (quoting Irvin v. Dowd, 366 U.S. 717, 722 (1961)). Article 2, Section 20 of the Oklahoma Constitution and likewise guarantee a criminal defendant a fair trial by an impartial jury.

¶54 "[P]rejudicial pretrial publicity certainly can taint a jury to the extent that a fair trial is denied the accused." DeRosa, , ¶ 18, 89 P.3d at 1134. However, jurors need not be "totally unaware of the case that they are called upon to try." Id., , ¶ 17, 89 P.3d at 1134. "It is sufficient if [a prospective] juror can lay aside his [or her] impression or opinion and render a verdict based on the evidence presented in court." Irvin, 366 U.S. at 723. There is thus a "rebuttable presumption that the accused can receive a fair trial in the county in which the offense occurred[.]" Hain v. State, , ¶ 7, , 1136. "[T]he burden of persuasion is on the accused, who must show actual exposure to the publicity and resulting prejudice by clear and convincing evidence." Id.

¶55 On appeal, after a trial court has denied a defendant's change of venue motion and the defendant has been tried and convicted, "the question is no longer about hypothetical and potential unfairness, but about what actually happened during the defendant's trial." DeRosa, , ¶ 19, 89 P.3d at 1135. This Court has adopted the two-part approach set forth in Murphy v. Florida for appellate review of alleged due process violations resulting from jury knowledge and pre-trial publicity. DeRosa, , ¶ 20, 89 P.3d at 1135. First, we look to whether the defendant's conviction was "obtained in a trial atmosphere that [was] utterly corrupted by press coverage." Murphy, 421 U.S. at 798. A proceeding "entirely lacking in the solemnity and sobriety to which a defendant is entitled in a system that subscribes to any notion of fairness and rejects the verdict of a mob." Murphy, 421 U.S. at 799. In these rare and extreme cases, we presume prejudice. Skilling v. United States, 561 U.S. 358, 381 (2010); Bench, , ¶ 24, 431 P.3d at 945. See also Nebraska Press Ass'n. v. Stuart, 427 U.S. 539, 554 (1976) (observing that "pretrial publicity even pervasive, adverse publicity does not inevitably lead to an unfair trial").

¶56 Second, in the more common circumstance where the facts are not so egregious as to give rise to a presumption of prejudice, we review the "totality of the circumstances" to determine whether the accused received a trial which was "fundamentally fair." Bench, , ¶ 26, 431 P.3d at 946. We focus our review on the jurors who were actually impaneled, not on the jurors who might have been impaneled. DeRosa, , ¶ 21, 89 P.3d at 1135. The "ultimate issue" being "whether the trial court was in fact able to seat twelve qualified jurors who were not prejudiced against the accused." Andrew v. State, , ¶ 20, , 187, overruled on other grounds by Williamson v. State, , ¶ 51 n.1, , 762 n.1. See also DeRosa, , ¶ 21, 89 P.3d at 1135 (The relevant question is "whether the record suggests that the jurors before whom [the defendant] was tried were able to lay aside any prior knowledge or opinions regarding the case, and render a verdict based upon the evidence presented in court."). This evaluation includes a review of the voir dire statements of the individual jurors, voir dire statistics, and the community atmosphere as reflected in the news media. DeRosa, , ¶ 22, 89 P.3d at 1136.

¶57 Because the trial court conducts voir dire and personally observes the demeanor of the panelists--observations that cannot be fully captured in the transcription of the proceedings--we give the trial court considerable discretion on issues involving jury selection. Andrew, , ¶ 22, 164 P.3d at 187; see also Skilling, 561 U.S. at 386 ("Appellate courts making after-the-fact assessments of the media's impact on jurors should be mindful that their judgments lack the on-the-spot comprehension of the situation possessed by trial judges."). The defendant consequently has the burden of showing that "the trial court abused its discretion and that, as a result, the defendant was denied his right to a fair trial before an impartial jury." DeRosa, , ¶ 22, 89 P.3d at 1136.

¶58 Turning to the merits of Appellant's due process claim, the record does not reveal an irrepressibly hostile attitude that pervaded the community or undue influence by the various media sources and local publicity. A finding of presumed prejudice is thus not warranted. See Hain, , ¶¶ 9-10, 919 P.2d at 1136-37. Although there was considerable publicity of the case, "[m]edia coverage extends to most homicides, particularly capital cases." Braun v. State, , ¶ 32, , 793 (quotations and citation omitted). Juror exposure to such media coverage, alone, does not create a presumption of prejudice. Bench, , ¶ 25, 431 P.3d at 946 (citing Murphy, 421 U.S. at 799). A showing of egregious publicity that actually pervaded the trial proceeding is needed. Andrew, , ¶ 20, 164 P.3d at 187; Hain, , ¶¶ 8-10, 919 P.2d at 1136; Shultz v. State, , ¶¶ 23-24, , 1330.

¶59 In this case the pretrial publicity, comprised of conventional news coverage and less conventional coverage, such as social media platforms, local memorials and fundraisers, was spread over the course of the thirty-one months between the date of the offense and Appellant's trial. See Braun, , ¶ 32, 909 P.2d at 793 (finding the time span over which the publicity occurred somewhat dispositive). The publicity was neither invidious nor inflammatory in nature. See Murphy, 421 U.S. at 800 n.4 (noting distinction between "largely factual publicity" and "that which is invidious or inflammatory"). Nor has Appellant demonstrated the sort of pervasive, circus-like atmosphere that often characterizes the rare cases of presumed prejudice. Shultz, , ¶ 23, 811 P.2d at 1330. Indeed, contrary to Appellant's assertions, nothing in the record suggests that the individuals summoned to serve as jurors were "utterly corrupted" by the pretrial publicity and thus predisposed to convict. See Murphy, 421 U.S. at 798. Appellant thus fails to show the setting of his trial was presumptively prejudicial.

¶60 Appellant also fails to show actual prejudice. Notably, at no point did Appellant rely on the actual voir dire process to argue that a fair jury could not be seated due to pretrial publicity. The absence of such argument is telling and suggests trial counsel's agreement that the twelve jurors ultimately seated were capable of fairly and impartially deciding Appellant's case based on the evidence presented at trial. An examination of the totality of the circumstances in this case confirms that Appellant received a fair trial by a panel of impartial, indifferent jurors.

¶61 The record shows that a total of one hundred seventeen potential jurors were questioned to seat the twelve jurors who actually sat on Appellant's jury. Ninety-seven of those questioned on voir dire had some level of familiarity with the facts of the case. Of these ninety-seven, thirteen were struck for cause. Three were struck because they knew the victim and/or the victim's family. One was struck because of their close friendship with the wife of the victim's brother and the additional knowledge about the case brought about by this relationship. The remaining nine jurors were struck because of their inability to set aside their prior knowledge or opinion about the case.

¶62 Of the twelve jurors selected to serve on the jury, nine had some, albeit minimal, knowledge about the case. Most were simply aware that a police officer had been killed and knew no details about the case. Each clearly indicated or affirmed that they could be impartial. Appellant did not challenge any of these jurors for cause, indicating there was no reason to question their ability to be impartial. See DeRosa, , ¶ 31, 89 P.3d at 1139. Nor does Appellant claim on appeal that any of these jurors should have been struck for cause.

¶63 Appellant asserts, however, that three of the seated jurors that were familiar with the case--K.W., J.R. and A.W.--gave answers on voir dire that indicate bias. A mere indication of bias is insufficient to rebut the presumption of a juror's impartiality. See Irvin, 366 U.S. at 723 ("To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard."). Appellant's allegation is based on nothing more than speculation and does not establish bias. Further, K.W., J.R. and A.W. each acknowledged that they could lay aside their impressions, knowledge or feelings and be impartial. Id. (It is enough "if [a] juror can lay aside his impression or opinion and render a verdict based on the evidence[.]"). See also Bear v. State, , ¶ 8, , 954 ("Whether jurors have opinions that disqualify them is plainly one of fact and the resolution of such question is entitled to special deference by a reviewing court."). Appellant thus fails to demonstrate that any of the seated jurors were biased against him due to adverse pretrial publicity.

¶64 Appellant received a fair trial before an impartial jury. Appellant "has failed to show that the setting of [his] trial was inherently prejudicial or that the jury-selection process of which he complains permits an inference of actual prejudice." Murphy, 421 U.S. at 803. The trial court did not abuse its discretion by denying Appellant's motion for a change of venue. Proposition V is denied.

4. Range of Punishment (Count 3) 

¶65 In Proposition VI, Appellant complains that the jury was incorrectly instructed on the sentencing range for the Count 3 crime of possession of controlled dangerous substance. Instruction No. 34 told the jury that the crime of possession of controlled dangerous substance "is punishable by imprisonment for two to ten years and by a fine not exceeding $5,000.00." The jury's verdict imposed the maximum sentence for this crime authorized by the instruction, namely, ten years imprisonment plus a $5,000.00 fine. Appellant complains that the correct range of punishment for possession of methamphetamine, a Schedule II substance, is not more than five years imprisonment and by a fine not exceeding $5,000.00. See (B)(1). The State concedes plain error and requests that this Court modify Appellant's sentence on Count 3 to the maximum term of five years imprisonment plus a fine of $5,000.00. Based upon this concession, we find that Instruction No. 34 gave the wrong sentencing range. Relief is warranted in the form of sentence modification. . Appellant's sentence on Count 3 is therefore MODIFIED to five years imprisonment and a $5,000.00 fine, the maximum authorized by the governing statute for this offense. Proposition VI is granted.

5. Sufficiency of the Evidence (Count 2) 

¶66 In Proposition VII, Appellant challenges the sufficiency of the evidence supporting his Count 2 conviction for knowingly concealing stolen property. Appellant complains that insufficient evidence was presented at trial to prove beyond a reasonable doubt that he knew or believed the Springfield XD 9mm semiautomatic pistol in his possession was stolen.

¶67 The issue in this proposition is whether, taken in the light most favorable to the State, any rational trier of fact could have found the essential elements of the charged crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319 (1979); Davis, , ¶ 74, 268 P.3d at 111. This analysis requires examination of the entire record. Young v. State, , ¶ 35, , 35. "This Court will accept all reasonable inferences and credibility choices that tend to support the verdict." Davis, , ¶ 74, 268 P.3d at 111. "[T]he law makes no distinction between direct and circumstantial evidence and either, or any combination of the two, may be sufficient to support a conviction." Baird v. State, , ¶ 31, , 884.

¶68 The elements of knowingly concealing stolen property as charged here are: 1) concealing or withholding; 2) stolen or fraudulently/feloniously obtained personal property; 3) from the owner or person having possessory rights; 4) known or believed by the defendant to have been stolen or fraudulently/feloniously obtained; 5) with the intent to deprive permanently. ; Instruction No. 5-113, OUJI-CR (2d). The mere possession of stolen property is not enough to prove the elements of this crime. However, the possession of stolen property "supplemented with other facts inconsistent with honest possession, creates a question of fact for the jury." Brooks v. State, , ¶ 6, , 219; Williams v. State, , ¶ 5, , 504; Billings v. State, , ¶ 14, , 918. We have held that "[t]he State is not required to prove that an accused had actual knowledge that the property was stolen; it is sufficient to prove that the accused had reasonable cause to believe the property was stolen." Brooks, , ¶ 6, 714 P.2d at 219.

¶69 Taken in the light most favorable to the State, insufficient evidence was presented at trial to prove beyond a reasonable doubt Appellant's commission of knowingly concealing stolen property. The record evidence showed that the murder weapon was stolen from the Tulsa residence of Phillip Pfanstiel in July 2016. Pfanstiel does not know Appellant and testified there was no reason for Appellant to have been in possession of his firearm at the time of Officer Terney's murder. The gun turned up missing from his home after his niece and her boyfriend did landscaping work for Pfanstiel while he was away running errands. According to Pfanstiel, both the niece and her boyfriend (who was not Appellant) "were acting weird" when Pfanstiel returned home. When he discovered the gun missing that night, Pfanstiel reported it stolen to Tulsa Police. Pfanstiel retained the box he received with the Springfield XD 9mm at purchase from an Academy Sporting Goods store in Texas. The box contained the serial number for the stolen gun and matched the serial number found on the murder weapon.

¶70 The State's evidence showed merely that Appellant possessed a gun that was stolen from its rightful owner roughly eight months earlier in Tulsa. It does not establish the circumstances under which Appellant obtained the gun, let alone demonstrate circumstantially that Appellant knew that the gun was stolen. Nor does the State's evidence show that Appellant had reasonable cause to believe the gun was stolen. Evidence that Appellant lied about his identity to Officer Terney during the traffic stop does not establish that Appellant knew the gun was stolen. Nor does his possession of methamphetamine, the contents of his truck or his failure to fill out paperwork for the purchase of the gun. The State's evidence showed that Appellant lied to the victim to avoid being arrested and jailed on an active felony warrant, not because the gun was stolen.

¶71 The State cites Brooks in support of its claim that sufficient evidence was presented to support Appellant's Count 2 conviction. Brooks, however, involved an admission by the defendant to two separate people that he knew the forty rings in his possession were stolen. Id., , ¶ 3, 714 P.2d at 218. Admissions by a defendant are sufficient to prove the knowledge element of the crime of knowingly concealing stolen property. Unlike in Brooks, however, there was no evidence in the present case that Appellant ever admitted knowing the murder weapon was stolen. Brooks is therefore distinguishable.

¶72 The State also cites Billings v. State, , to support its argument. In Billings, the defendant was found asleep at the steering wheel of a stolen truck parked eight blocks from the residence where it was stolen hours earlier. When confronted by a police officer, the defendant was unable to produce identification and instead gave a false name. After running a check, the police officer discovered the defendant's real identity and placed him under arrest. When the police officer asked the defendant what he was doing there, he responded that he was waiting for his girlfriend who lived up the street. The defendant also claimed the truck belonged to his friend, but then could not give a name or address for this person. Id., , ¶¶ 4, 6, 650 P.2d at 916. At trial, the defendant's defense was that a person known as Mike loaned him the truck. Id., , ¶¶ 8, 13, 650 P.2d at 917-18.

¶73 We found sufficient evidence was presented to support the conviction for knowingly concealing stolen property in Billings. We viewed the evidentiary sufficiency question as "very close" with respect to whether the defendant had reasonable cause to believe the truck was stolen. Id., , ¶¶ 12-13, 650 P.2d at 917. We observed that the State generally must resort to wholly circumstantial evidence when proving the knowledge element of this crime. Id., , ¶ 12, 650 P.2d at 917. We noted too that "[t]he burden of showing such requisite knowledge on the part of a defendant is a major dilemma facing prosecutors in cases of this type." Id.

¶74 In Billings, the false name Appellant gave to the police officer was just one piece of the circumstantial web of evidence showing the defendant had reasonable cause to know the truck was stolen. We have nothing comparable in the present case. The State simply did not meet its burden to prove the Count 2 crime of knowingly concealing stolen property. Taken in the light most favorable to the State, the evidence showed that Appellant avoided disclosure of his identity to Officer Terney during the traffic stop to avoid arrest on the active felony warrant from Okfuskee County. The facts surrounding the murder do not show beyond a reasonable doubt that Appellant knew, or had reasonable cause to believe, the Springfield XD 9mm was stolen. Insufficient evidence was presented to support Appellant's conviction on Count 2 for knowingly concealing stolen property. Proposition VII is granted.

6. Motion to Disqualify the Prosecution Team

¶75 On November 19, 2018, then Pottawatomie County District Attorney Richard L. Smothermon sent a letter to the Oklahoma Attorney General requesting that Smothermon's office be recused from any further prosecution of Appellant's case (CF-2017-176) and the case of co-defendant Brooklyn Williams (CF-2017-206). To support the recusal request, Smothermon wrote in pertinent part the following:

* * * Due to recent events in my district, the family of Officer Terney has questioned whether this office will have a conflict in the continued prosecution of these cases.

In order to avoid the appearance of any impropriety, I respectfully recuse my office from any further prosecution of these cases. Because of the complexity of these cases, I took the liberty of speaking with District Attorney Greg Mashburn who has agreed to accept both cases should you feel it appropriate.

¶76 On November 27, 2018, the Attorney General's Office granted Smothermon's request to recuse his District 23 office from further prosecution in both cases. The AG's letter cited as authority for the recusal. Greg Mashburn, the Cleveland County District Attorney, along with his District 21 staff, was appointed by the AG's Office to take over both cases. Mashburn and two Cleveland County assistant district attorneys, Travis White and Patricia High, subsequently took over the prosecution of this case and represented the State at Appellant's trial.

¶77 In Proposition VIII, Appellant complains that Ms. High was disqualified from the prosecution of his case, and that her participation as a member of the trial team warrants reversal of his convictions. Appellant contends that Ms. High was employed by Smothermon's office as an assistant district attorney at the time of the recusal request; that the AG's Office recused Smothermon and all of his assistants due to a conflict of interest in the case; and that Ms. High was therefore disqualified from participating in the trial of Appellant's case due to a conflict of interest.

¶78 The record confirms that Ms. High was on Smothermon's District 23 staff prior to the recusal. Ms. High was one of the District 23 prosecutors who appeared on behalf of the State, and who presented prosecution witnesses, at the joint preliminary hearing for Appellant and Williams held November 9, 2017. The recusal issue was first litigated, and denied by the trial court, in Brooklyn Williams's case on January 24, 2019, shortly before her trial commenced. A pretrial hearing was held on Williams's motion to disqualify. At that hearing, Smothermon testified that the request for recusal of his office was made because the victim's family expressed concern to him that the District Attorney-elect, Alan Grubb, had a conflict of interest that would prevent Grubb from prosecuting the case when he took office on January 7, 2019. Smothermon testified that he was never made aware of any conflict within his office, that the entire reason for the request for recusal was the "very rational and real concerns about how the incoming DA's office might have multiple conflicts" in both cases.

¶79 Tonisha Rapp, the victim's sister, testified that Grubb had represented her mother's now ex-husband, Michael Terney, in a divorce proceeding in the months leading up to the election. Rapp testified that Grubb made multiple unsubstantiated allegations against her, accusing Rapp of taking money from the payment of Officer Terney's death benefits. Rapp also testified that Grubb had "made very ruthless attacks on our family members, unsubstantiated attacks against us throughout the whole divorce proceeding, and we felt threatened by him." Rapp testified that Grubb's legal fees in the divorce case were based on how much he recovered from Officer Terney's death benefits. Rapp believed that Grubb personally profited from the victim's death due to this fee arrangement. Rapp testified that her family did not trust Grubb to do his job and "[t]here was no way that we could ever have a relationship" with Grubb after his conduct in the divorce case.

¶80 When Grubb announced that he was running for district attorney, Rapp expressed her concerns to Smothermon's victim-witness coordinator and asked what options the family had to "be protected" in the event Grubb won the election. Smothermon sent the letter seeking recusal of his office shortly after the November 6, 2018, election in which Grubb was elected district attorney for District 23. Rapp testified that her family did not perceive any conflict of interest prior to Alan Grubb taking office as Pottawatomie County's District Attorney.

¶81 The trial judge ruled as follows:

I heard the testimony here of the witness--well, of two witnesses, but the second witness in particular. And she certainly painted a picture of having conflicts with the new district attorney because of civil litigation and what happened prior to him being sworn in as the district attorney.

And it would make sense to me, and I kind of wish that this letter was written that way, that the future DA has conflicts with the victims, and therefore, they shouldn't be doing this case. That's probably the way the letter should have been written. The way it's written right here is [ ] you had to have an explanation--an in-depth explanation as to exactly why you recused, but then somebody else in your office comes over and ends up handling the case.

As I've indicated before, I don't have any problem with talking to the district attorney ahead of time and seeing if he's going to be willing to take a case, that's just a recommendation to the AG. He can get information from any source he wants when he makes his appointment.

And [the AG] certainly could have said, well, thank you, but I'll handle it from here and appoint any DA he wanted to, so that part doesn't bother me at all. I'll tell you, this would have been a lot easier if Ms. High wasn't handling this case.

Well, I've been obviously the judge involved with this case from day one, and there has never been a conflict with the present district attorney--or Mr. Smothermon, rather--his office in handling this particular case. I doubt very seriously if one arose in the last week he was in office that led to this.

So by the actions of the State and the timing, it tends to support the testimony of Ms. Rapp as far as what conflict we're talking about and when it occurred. 

All right. The order of the Court is that the motion be denied.

¶82 Later, Appellant's counsel filed a pretrial motion to disqualify the Cleveland County prosecutors from handling Appellant's case. After hearing argument from both parties, the trial court relied upon his earlier ruling in Brooklyn Williams's case and summarily denied Appellant's motion.

¶83 On appeal, Appellant focuses on the argument that Ms. High was disqualified from any further participation in the case after the AG's letter granting recusal. Appellant argues that "Richard Smothermon, in requesting the Attorney General disqualify his office, stated it was himself and his office to be granted a recusal." Because Ms. High was an attorney with Smothermon's office at the time of the recusal, Appellant reasons that she carried the conflict over from Smothermon's office even when she became an assistant district attorney in Cleveland County under DA Greg Mashburn.

¶84 We review the trial court's ruling on a defendant's motion to recuse or disqualify a prosecutor for abuse of discretion. See Hain v. State, , ¶ 15, , 1137. The State contends on appeal that plain error review applies because Appellant did not renew at trial his request for disqualification. Appellant does not deny that the disqualification issue was not renewed at trial but claims the State cites no authority requiring recusal requests based on conflicts of interest to be renewed at trial. We agree with the State that plain error applies under these circumstances. Faulkner v. State, , ¶ 5, , 431 (reviewing for plain error a claim that the appellant's due process rights were violated when his former attorney prosecuted him in a matter substantially related to the former representation when the issue was not renewed at trial). To show plain error, Appellant must demonstrate an actual or obvious error affecting his substantial rights. We correct plain error only if the error seriously affects the fairness, integrity or public reputation of the judicial proceedings or otherwise represents a miscarriage of justice. Metoyer v. State, , ¶ 20, 526 P.3d 1158, 1166.

¶85 Appellant fails to show error, plain or otherwise. The record makes clear there was no conflict of interest requiring disqualification of Smothermon or his District 23 office. The conflict of interest arose only when his successor, Alan Grubb, was sworn in as district attorney in January 2019. The trial court's finding that there was no conflict of interest by Smothermon, or anyone else on his staff, is fully supported by the record. The trial court's finding that Smothermon's request for recusal was preemptive and based on the conflict of interest that would occur between the victim's family and Grubb when the district attorney-elect was sworn into office is also fully supported by the record. We note too there is no evidence that Grubb ever attempted to reclaim authority over the case after being sworn in as DA.

¶86 On these facts, Ms. High was not burdened with a conflict of interest of any kind that required disqualification when she returned to Appellant's case as a Cleveland County prosecutor. Appellant shows no prejudice, let alone that he was denied due process, based on the claim that Ms. High was conflicted out of the case. At most, Appellant's argument suggests the appearance of a conflict of interest by Ms. High. Under these circumstances, Appellant must show actual harm which he does not do. See Faulkner, , ¶¶ 6, 10, 260 P.3d at 431, 433; Wilkey v. State, , ¶ 2, , 348-49. Ms. High's participation in the prosecution of this case as an assistant district attorney in Cleveland County therefore does not warrant relief. Proposition VIII is denied. 

7. Prosecutorial Misconduct

¶87 In Proposition IX, Appellant alleges various instances of prosecutorial misconduct. We will not grant relief for improper argument unless, viewed in the context of the whole trial, the statements rendered the trial fundamentally unfair, so that the jury's verdict is unreliable. Darden v. Wainwright, 477 U.S. 168, 181 (1986); Pullen v. State, , ¶ 13, , 927.

¶88 First, Appellant contends that prosecutorial misconduct during pretrial proceedings deprived him of a fair trial. Appellant complains that the State presented an affidavit with false assertions from an investigator as part of its written response to Appellant's motion for change of venue. Appellant acknowledges that he had the opportunity to rebut the purported misstatements in the investigator's affidavit at a pretrial hearing on his motion to change venue with testimony from a defense investigator. As discussed above in Proposition V, Appellant's motion for change of venue failed because the total record does not show that a presumption of prejudice based on pretrial publicity was warranted. Further, the actual record of voir dire for the jurors who heard Appellant's case failed to show actual prejudice due to pretrial publicity or any other factor. Under these circumstances, Appellant fails to show that he was denied a fundamentally fair trial based on the State's written response, the investigator's affidavit or the trial court's ruling denying the motion for change of venue.

¶89 Second, Appellant complains that the State engaged in prosecutorial misconduct by challenging the admission at trial of portions of his police interviews. During the first stage of trial, defense counsel sought to introduce testimony about Appellant's statements during two police interviews conducted at the hospital. The trial court excluded this testimony as self-serving exculpatory statements that amounted to inadmissible hearsay when offered by the defense, against the State, to prove the truth of the matter asserted. See Phillips v. State, , ¶¶ 6-8, , 607. Defense counsel nonetheless was able to elicit testimony that Appellant said "I'm sorry guys" to a paramedic and a police officer riding with him in the back of the ambulance after the shooting. A police bodycam video showing this statement was also played for the jury.

¶90 During the penalty phase, the trial court--over the State's objection--allowed the defense to elicit testimony in its case-in-chief about alleged remorse Appellant expressed during the police interview at the hospital. The trial court ruled this was proper mitigation evidence during the penalty phase. Investigator Jason Holasek was present during the interview and testified that Appellant expressed remorse to him. According to Holasek, Appellant said "I'm sorry" two or three times and also said "fellas, I hope you believe that." Holasek testified he ended the interview because Appellant seemed emotional. On cross-examination, Holasek clarified that Appellant never said during the interview that he was sorry for murdering Officer Terney; never said that he was sorry for shooting the victim; and never said what he was sorry for.

¶91 Next, the defense introduced a short video of Appellant taken from Deputy Brian Columbus's bodycam. Deputy Columbus was with Appellant at the hospital after the murder. During the video, Appellant, who appears to be sitting on a toilet, can be heard telling the deputy that he was sorry for "whatever I done." Appellant also said that he could not remember what happened.

¶92 Appellant fails to show on this record prosecutorial misconduct. The State's evidentiary objections during first stage were based on controlling law and thus wholly proper. Further, Appellant was able to explore during the penalty phase the issue of his alleged remorse at the hospital through the testimony of Investigator Holasek and Deputy Columbus. Based on this evidence, the trial court instructed the jury that evidence had been introduced that "Byron Shepard is sorry and has expressed remorse. He has apologized to at least four different police officers and first responders."

¶93 During closing argument, the State argued that Appellant had showed no remorse for the victim's death. This argument was based on reasonable inferences drawn from the record evidence. The State referenced recordings of jail phone calls in which Appellant made no expression of remorse for the murder, but instead bragged to a friend about living the "gangster life" in the county jail while lamenting that it was not nearly as much fun as he thought it would be. Appellant described himself as "a celebrity" in lockup and asked rhetorically why the authorities "got to take everything so serious" about his case. Towards the end of the call, Appellant is heard matter-of-factly saying how "it's always a shame when a cop dies" and laughing about telling his defense team how they needed to worry about the time he "lured" a man to his house and "beat him" with a pipe. Appellant also said on the call that he needed his friend to go over and "ring" the bell of a man for punching a hole in Appellant's mother's wall. The State reasonably argued that the jail phone call captured Appellant's true attitude about the murder.

¶94 To the extent Appellant relies upon non-record evidence from his Rule 3.11 application in support of this claim, he is not entitled to relief. Appellant's police interview at the hospital was not made part of the trial record. Supplementation of the record under Rule 3.11 is not appropriate merely to cure a defendant's failure to preserve a prosecutorial misconduct claim below. Lamar v. State, , ¶ 55, , 297. Appellant fails to show prosecutorial misconduct and we deny relief for this claim.

¶95 Third, Appellant complains that the prosecutor made improper argument and objection to proposed defense language for Instruction No. 46 that evidence had been introduced that Appellant, at the time of the trial, was being treated for unspecified neurocognitive disorder and unspecified depressive disorder. At the prosecutor's request, the trial court changed the language in the instruction to state that Appellant "suffers from unspecified neurocognitive disorder and unspecified depressive disorder, which can be treated." Appellant fails to show that he was deprived of a fundamentally fair trial in violation of due process from the prosecutor's objection. The change in the language of the instruction for this mitigating circumstance was slight and did not detract from the testimony of Dr. Antoinette McGarrahan, the defense neuropsychologist, that Appellant was taking three medications while incarcerated for mood stabilization.

¶96 Nor did the language used detract from the numerous other mitigating circumstances listed in Instruction No. 46 that were related to Appellant's mental health issues. This included statements, based on testimony from the defense experts, that evidence was introduced that Appellant "suffers from a long history of anxiety and depression due to long term methamphetamine use"; "has severely low self worth"; "has reduced intellectual ability, problems in attention and concentration, poor reasoning skills, and memory deficits"; "has problems with brain processing and working memory compared to men of same age and educational background"; "has more adverse childhood experiences . . . than 95% of the population"; "suffers from Complex Post Traumatic Stress Syndrome due to severe and chronic childhood trauma, which is treatable"; and "is open to treatment." Appellant was not deprived of a fundamentally fair sentencing proceeding based on the language of Instruction No. 46. Relief is denied for this claim.

¶97 Fourth, Appellant claims that prosecutorial misconduct during the first stage closing argument surrounding the text message evidence warrants relief. Appellant did not object to these remarks, thus waiving review on appeal of all but plain error. Vance v. State, , ¶ 12, , 531. We find no error, plain or otherwise, from the challenged arguments. "[T]he parties have wide latitude to argue the evidence and reasonable inferences from it in their closing arguments." Id., , ¶ 14, 519 P.3d at 531. Taken in context, the prosecutor's challenged comments about the text message evidence was reasonable comment on the evidence presented, not prosecutorial misconduct. At issue was the meaning of the text message, sent from Appellant's phone during an exchange with Brooklyn Williams about his stolen welding truck, that: "They made one mistake LOL. Push me too far and jail isn't an option. I can't get them all but I promise the first four or five are mine."

¶98 The State reasonably argued this text message, sent roughly one week prior to Officer Terney's murder, was evidence showing malice aforethought in the present case. The prosecutor argued that even if Appellant was talking about taking out four or five people who were not police officers, the text message evidence still showed what Appellant was capable of at the time of Officer Terney's killing.

¶99 The prosecutors here did not misstate the evidence. Instead, they drew reasonable inferences from the evidence to argue that Appellant had malice aforethought when he shot and killed Officer Terney. This was wholly proper. See Sanders v. State, , ¶ 21, , 286 ("Counsel enjoy a right to discuss fully from their standpoint the evidence and the inferences and deductions arising from it."); Darks v. State, , ¶ 53, , 166 ("the right of argument contemplates a liberal freedom of speech, and . . . the range of discussion, illustration, and argumentation is wide"); Pebeahsy v. State, , ¶ 11, , 1165 (reasonable inferences adduced from the evidence do not amount to prosecutorial misconduct). Relief is denied for this claim.

¶100 Fifth, Appellant complains that the prosecutor improperly argued facts not in evidence during first stage closing with respect to statements made in the autopsy report prepared by Dr. Nichols. Appellant complains that his right to confrontation was denied because the prosecutor argued facts not in evidence about Dr. Nichols's report. Appellant did not argue below that his confrontation rights were violated by this argument of the prosecutor. We review this claim for plain error only. Brown v. State, , ¶ 11, , 580; Glossip v. State, , ¶ 96, , 159. We find no error, plain or otherwise, from the challenged argument. The prosecutor reasonably responded to defense counsel's use of information from an absent witness's conclusions in the original autopsy report. It was fair game for the State to question the value of Dr. Nichols's statement in a report concerning the details about the gunshot wound to the victim's thigh based on his absence as a witness, the limited nature of the testifying pathologist's conclusions and other evidence in the case refuting the claim that Officer Terney shot himself. Appellant was not deprived of a fundamentally fair trial, or any other constitutional right, based on the challenged argument by the prosecutor. Relief is denied for this claim.

¶101 Sixth, the prosecutor did not commit misconduct with the argument that Appellant's text message threats to Brooklyn Williams constituted evidence demonstrating malice aforethought. In this regard the prosecutor argued:

[Appellant] knows what--obviously knows what happens when you pull a gun on someone and point it at them because think of the threats in those text messages. Tells Brooklyn Williams I'll put one between your eyes. Is that going to be an accident too? Or the other people that he was talking about taking out.

Then he tells Brooklyn Williams if I didn't love [your son] so much, I'd kill you. Was that going to be an accident too? So the other threats goes to what he intends when he points a gun at somebody and pulls the trigger.

¶102 Defense counsel objected to the phrasing of the prosecutor's argument, complaining that it confused the intent at issue in the present case with the intent Appellant had for Brooklyn Williams. The trial court directed the prosecutor when speaking about intent to the jury "to refer to the elements in this case only." At defense counsel's request, the trial court admonished the jury not to "lose track of the fact that when we're talking intent, it's for this case only."

¶103 On appeal, Appellant claims that the prosecutor's argument was intended to arouse anger and inflame the jury and raise societal alarm. Appellant also complains that the trial court's admonishment failed to adequately cure the improper reference by the prosecutor. These objections were not raised at trial thus limiting our review to plain error only. Brown, , ¶ 11, 177 P.3d at 580; Glossip, , ¶ 96, 157 P.3d at 159. There was no plain error as the trial court's admonition cured any possible error. See Vanscoy v. State, , ¶ 20, , 830. Appellant is not entitled to relief based on the admonition given because defense counsel requested the language used. This aspect of Appellant's prosecutorial misconduct claim is waived as invited error. Cuesta-Rodriguez v. State, , ¶ 73, , 237. All things considered, Appellant was not deprived of a fundamentally fair trial from the comments by the prosecutor. Relief is denied for this claim.

¶104 Seventh, Appellant claims that prosecutorial misconduct deprived him of a fundamentally fair sentencing proceeding. Appellant says the prosecutor during closing argument misstated and mischaracterized the penalty phase evidence, engaged in name calling, offered personal opinions on Appellant's guilt or credibility, implied Appellant was lying and sought to inflame the passions of the jurors. Most of the prosecutorial argument challenged on appeal drew no objection at trial, limiting our review to plain error only. The prosecutor's arguments challenging the testimony of the defense psychological experts, the prosecutor's reference to the dashcam video and the prosecutor's request that the jury impose the death penalty so that justice was done for Appellant's crime amount to reasonable comments on the evidence and an appropriate recommendation on punishment that submitted the question of justice to the jury. See McElmurry v. State, , ¶ 137, , 32. There was no error, let alone plain error, from these comments by the prosecutor. Tryon, , ¶¶ 139-41, 423 P.3d at 654-55.

¶105 Defense counsel did object when the prosecutor, during the State's first closing argument, commented that Breanna Shepard, the Appellant's eighteen-year-old daughter, "is as much of a victim." Ms. Shepard testified on Appellant's behalf as a mitigation witness during the penalty phase. Ms. Shepard testified that she did not know the bad side of her father, which included domestic violence against her mother, but that she had heard the stories. Ms. Shepard told the jury she nonetheless loved Appellant, wanted to continue having a relationship with him and did not want him to receive the death penalty.

¶106 The prosecutor's challenged comment about Ms. Shepard being "as much of a victim" does not amount to prosecutorial misconduct when taken in context. After the trial court overruled Appellant's objection, the prosecutor argued:

We don't pick our parents. We don't pick our parents. [Appellant] didn't pick his mother. And tells you on Page 2 or 3 [of Instruction No. 46] that he loves her unconditionally. Breanna Shepard doesn't get to pick her father. And she probably does love him. Of course she doesn't want him to receive the death penalty.

¶107 Taken in context, the prosecutor's comments addressed what was obvious, namely, that Ms. Shepard's pain and agony was the product of Appellant's criminal actions. The prosecutor gave her interpretation of this evidence to the jury which is permitted during closing argument. There was no prosecutorial misconduct with these comments.

¶108 Finally, we consider the prosecutor's statement, on two separate occasions during his final penalty-phase closing, that Appellant was a coward. The first instance when the prosecutor called Appellant a coward occurred as follows:

He brought his daughter in here. Defendant brought his daughter in here. There's no age requirement for 18 years old to testify. But he brought his 18-year-old daughter in here. Ladies and gentlemen, I submit to you he's a coward for doing that.

¶109 Defense counsel objected to this particular comment, urging during a bench conference that the prosecutor "knows as well as I know that the Defendant didn't bring anybody in here. He can say the Defendant's counsel brought him in here. But it's just--it's so unfair." The prosecutor responded that defense counsel was doing her job, but Appellant "allowed it to happen." After a long discussion at the bench, the trial court denied a defense motion for mistrial and simply directed the State to move on.

¶110 When the prosecutor resumed, he told the jury: "Not only that, but he was a coward on March 26th, 2017, too when he pulled the trigger and killed Justin Terney." No defense objection was registered to this comment, waiving review for all but plain error.

¶111 On appeal, the State concedes error from both comments. However, the State tells us relief is unwarranted because Appellant was not deprived of a fundamentally fair trial in violation of due process from these errant comments. The State contends these two fleeting comments did not impact the outcome of the sentencing proceeding.

¶112 We have repeatedly held that name calling is looked upon with disfavor and prosecutors should refrain from airing their personal opinions in this manner. E.g., Hanson v. State, , ¶ 16, , 50; Malicoat v. State, , ¶ 32, , 401. The prosecutor's comments here undoubtedly were improper. Nonetheless, we agree that Appellant was not deprived of a fundamentally fair sentencing proceeding in violation of due process by these comments. The Supreme Court has made clear that, for purposes of due process, it "is not enough that the prosecutors' remarks were undesirable or even universally condemned." Darden, 477 U.S. at 181 (internal quotation omitted). Rather, the relevant question is whether the challenged comments by the prosecutor so infected the trial with unfairness as to make the resulting sentence a denial of due process. Id.

¶113 The challenged comments here were eclipsed by the strong evidence presented by the State in support of the four separate aggravating circumstances found by the jury. The evidence overwhelmingly showed that Appellant murdered Officer Terney for the purpose of avoiding lawful arrest or prosecution on the felony arrest warrant from Okfuskee County and that Officer Terney was acting as a peace officer in the performance of his official duty when he was murdered. See (5),(8).

¶114 The State's evidence also overwhelmingly supported the prior violent felony and continuing threat aggravating circumstances. See (1),(7). The State introduced a certified judgment and sentence document showing that Appellant was convicted in Okfuskee County Case No. CF-2011-54 of assault and battery with a dangerous weapon for luring Christopher Buxton to a residence and beating him with either a metal pipe or aluminum bat. The State also presented testimony from Buxton describing the beating that Appellant inflicted on him. Buxton testified Appellant repeatedly beat him "from shoulder to ankle" and that he was struck more than ten times with either a metal pipe or aluminum bat. When Buxton asked Appellant to stop, Appellant said "the only way you are leaving here is in a body bag." Buxton still has a scar from where his head was bashed open during the attack, requiring seventeen staples. Buxton also suffered a broken rib that never healed properly and still causes him pain today. This evidence was relevant to prove both the prior violent felony aggravator and the continuing threat aggravator.

¶115 In addition, the penalty phase evidence showed that Appellant had out-of-control anger issues towards women throughout his adult life. The evidence showed that Appellant physically attacked a girlfriend named Jessie (last name unknown) in Amanda Sanders's driveway. When Sanders, who was visibly pregnant, attempted to intervene, Appellant put a shotgun in Sanders's face after telling her to mind her own business or he would shut her up. Appellant was also routinely violent during his relationship with Brandy Armstrong, leaving visible cuts, bruises and other injuries and on a few occasions choking her to the point of unconsciousness with his hands. Appellant kicked Armstrong down the front stairs of their trailer house while she was holding the couple's infant son and beat her with his fist when she returned to collect her things the next day. Appellant also beat Brittany Swayze, a woman with whom he was in a relationship for several years, using his fists during arguments and choking her to the point of unconsciousness at least once. Appellant also pulled out his penis during a domestic dispute with Brittany and, after pushing her sixteen-year-old brother, Cody Swayze, down onto a couch told Cody that he (Appellant) could make him "suck it". The record shows Appellant's use of methamphetamine and alcohol fueled much of this violence.

¶116 The recordings of the jail phone call in which Appellant is heard bragging to a friend about living the "gangster life" in the county jail while awaiting trial on the present charges and lamenting that it was not nearly as much fun as he thought it would be, discussed above, also showed Appellant's future dangerousness. See Turrentine v. State, , ¶ 78, , 977 ("A defendant who does not appreciate the gravity of taking another's life is more likely to do so again.") (internal quotation omitted).

¶117 As with the aggravating circumstances, nothing about the prosecutor's comments calling Appellant a coward could distract the jury from considering fully the enormous amount of mitigation evidence presented by the defense about virtually every aspect of his life and mental health. This evidence was presented through friends and family members of Appellant. The mitigation evidence included testimony concerning Appellant's drug abuse; his difficulties at birth; the beatings Appellant's mother suffered as a child at the hands of her mother; Appellant's educational background; his family background; his work history as an ironworker and skill as a mechanic; his manufacturing of methamphetamine; his generosity towards others; the domestic violence he witnessed and received as a child from his step-father and his defense of his mother; the love he received from his grandparents and the care he provided for his sick and dying grandfather; his prescription for Xanax; his care for Sondra Jones when she had cancer; meth use by Appellant's mother and step-father; drug dealing by Appellant's mother; use by Appellant's mother of methamphetamine manufactured by Appellant; the depression and low-esteem suffered by Appellant's mother as an adult, her near-fatal overdose and her stay in a psychiatric hospital on two separate occasions; the mental cruelty Appellant endured at the hands of his mother; the lies Appellant's mother told him about the identity of his father; the positive influence of Appellant's parents, grandparents and others in the community; Appellant's defense of childhood friend Shannon Million from schoolyard bullies; the tantrums Appellant threw as a child when he did not get his way; the devastating impact in 2016 that the deaths of his grandfather and a friend, James Cole, had on Appellant; and the love of Appellant's friends and family, including his eighteen-year-old daughter, who want to continue to have a relationship with him and who do not want him to receive the death penalty.

¶118 As discussed above, Appellant also presented expert testimony from Dr. McGarrahan, the defense neuropsychologist, who testified that Appellant had borderline intellectual functioning and exhibited a pattern of anti-social traits like irresponsibility, impulsivity, failure to follow society's norms and getting in trouble with the law. However, Dr. McGarrahan clarified that Appellant does not meet the full diagnostic criteria for Antisocial Personality Disorder. According to Dr. McGarrahan, Appellant suffers from problem-solving deficits, impulsivity, poor planning and poor reasoning. She concluded that Appellant suffers from an unspecified neurocognitive disorder, a long history of untreated depression and drug and alcohol-use disorder. Dr. McGarrahan found that Appellant's childhood history was rife with adverse childhood experiences, meaning multiple traumas, that put him at risk as an adult to have negative outcomes, negative mental health issues, medical issues and behavioral problems.

¶119 Dr. Michael Gomez, a clinical psychologist specializing in trauma therapy for children and adolescents, testified that Appellant suffered from Complex Post-Traumatic Stress Disorder caused by multiple childhood traumas. The adverse childhood experiences causing Appellant's traumas include domestic violence in the household, parental drug use and psychological maltreatment and neglect by his mother. According to Dr. Gomez, Appellant's childhood trauma remains untreated. Individuals with the level of childhood trauma endured by Appellant typically engage in a higher use of drugs or alcohol as a coping tool to deal with traumatic stress symptoms and suffer anxiety, depression, aggression and conduct problems. Dr. Gomez testified that the chronic childhood trauma suffered by Appellant has resulted in his brain functioning in survival mode using quick, impulsive and aggressive decision making. Appellant went untreated despite the existence of therapies that would have been effective in resolving his traumatic stress symptoms. Dr. Gomez opined that Appellant's Complex PTSD can still be addressed today with effective therapy. This, in turn, may resolve the aggressive behaviors Appellant has exhibited as an adult. Appellant told Dr. Gomez that he was open to therapy.

¶120 This record shows that Appellant presented substantial evidence of mitigating circumstances for the jury to weigh against the evidence presented by the State in support of all four aggravating circumstances. See (C); . That evidence included the testimonials of friends and family members who did not want Appellant to receive the death penalty. Upon review of the total record, we find that Appellant was not deprived of a fundamentally fair sentencing proceeding in violation of due process from the prosecutor's comments here. At most, the prosecutor's comments describing Appellant as a "coward" amounted to an attempted rhetorical flourish that fell flat and had no impact whatsoever on the case. Relief is denied for this claim.

¶121 In summary, we find that the various instances of prosecutorial misconduct alleged in this proposition, when considered either individually or cumulatively, did not render Appellant's trial and sentencing proceeding fundamentally unfair such that the jury's verdicts are unreliable. Relief is unwarranted in this case for prosecutorial misconduct. Proposition IX is denied.

8. Intellectual Disability

¶122 In Proposition X, Appellant challenges the constitutionality of (C) which states:

[I]n no event shall a defendant who has received an intelligence quotient of seventy-six (76) or above on any individually administered, scientifically recognized, standardized intelligence quotient test administered by a licensed psychiatrist or psychologist, be considered intellectually disabled and, thus, shall not be subject to any proceedings under this section.

¶123 Appellant argues this provision violates the Eighth and Fourteenth Amendments because a defendant with just one score of 76 or over always falls outside the mandate of Atkins v. Virginia, 536 U.S. 304 (2002) that intellectually disabled offenders are categorically excluded from capital punishment. Id. at 317-21.

¶124 Appellant did not raise this claim below. Nor did he previously claim to be intellectually disabled, or otherwise request a hearing to address the issue of intellectual disability, as required by Oklahoma law. See (D),(E). The record shows why. Dr. McGarrahan, the defense neuropsychologist, testified at trial that Appellant has borderline intellectual functioning, not intellectual disability. Dr. McGarrahan administered to Appellant the Weschler Adult Intelligence Scale-Fourth Edition to assess his intellectual ability. Appellant's full-scale IQ score was 77 after being adjusted upward by Dr. McGarrahan from 73. The score adjustment was due to physical difficulties encountered by Appellant in the use of his dominant hand during the testing process.

¶125 At the time of Dr. McGarrahan's evaluation, Appellant had limited use of his left hand and arm from the gunshot wounds he sustained in this case. Indeed, Appellant told Dr. McGarrahan that his hand was numb and didn't have much feeling in it. As such, Appellant was unable to hold a pen or pencil in his dominant hand. This caused Appellant to be unable to use his dominant hand as required for two of the timed test batteries during the IQ testing. Dr. McGarrahan threw out the scores from the tests affected by Appellant's inability to use his dominant hand and recalculated his full-scale IQ score using research-based methods. This process resulted in a full-scale IQ score of approximately 77.

¶126 Appellant's failure to raise below his constitutional challenge to the intellectual disability statute waives review on appeal for all but plain error. We find no error, plain or otherwise. First, we have rejected a similar constitutional challenge to (C) in the past. See Fuston v. State, , ¶ 36, , 318. Second, Appellant fails to show how any purported deficiencies in the intellectual disability statute impacts him. The statute was never applied to him because he never raised the issue of intellectual disability during the trial court proceedings. Instead, he presented expert testimony showing he has borderline intellectual functioning. We observe too that Appellant has offered nothing on appeal to suggest that the score adjustment Dr. McGarrahan made was improper. On these facts, there is no error, plain or otherwise. See State v. Howerton, , ¶ 18, , 158 ("The traditional rule is that a person to whom a statute may constitutionally be applied may not challenge that statute on the ground that it may conceivably be applied unconstitutionally to others in situations not before the Court." (internal quotation omitted)). Proposition X is denied.

9. Ineffective Assistance of Counsel

¶127 In Proposition XI, Appellant contends that trial counsel's performance at trial was constitutionally ineffective for (1) failing to request a hearing to determine whether Appellant is intellectually disabled; (2) failing to object to Instruction No. 34 which gave the wrong range of punishment for the crime of possession of controlled dangerous substance; (3) failing to object to the various instances of prosecutorial misconduct alleged in Proposition IX that were unpreserved; (4) failing to argue for the admission of Appellant's statements to law enforcement during the penalty phase; (5) failing to present childhood photographs and family photographs of Appellant in mitigation during the penalty phase; and (6) failing to present a mitigation specialist during the penalty phase.

¶128 First, Appellant fails to show ineffective assistance of counsel with any of these claims. See Strickland, 466 U.S. at 687. Trial counsel was not ineffective for failing to request a hearing to determine whether Appellant is intellectually disabled. As discussed in Proposition X, Dr. McGarrahan testified at trial that Appellant has borderline intellectual functioning. Appellant's full-scale IQ score was 77 after being adjusted upward, from 73, by Dr. McGarrahan due to physical difficulties encountered by Appellant in the use of his dominant hand during the testing process. Appellant has offered nothing on appeal to suggest that Dr. McGarrahan's work in this case, including her conclusions with respect to Appellant's full-scale IQ, was somehow improper. Nor does he show what additional testing would prove. Trial counsel reasonably relied upon Dr. McGarrahan's conclusions in not pursuing an intellectual disability defense and in not challenging the constitutionality of (C). Appellant fails to show deficient performance or prejudice from counsel's failure to pursue this meritless issue. Metoyer, , ¶ 31, 526 P.3d at 1168; Stemple v. State, , ¶ 61, , 73.

¶129 Second, in Proposition VI, we cured the error stemming from the erroneous sentencing range set forth in Instruction No. 34 for the crime of possession of controlled dangerous substance. By modifying Appellant's Count 3 sentence, Appellant's claim of ineffective assistance for failing to object to this instruction is rendered moot. See White v. State, , ¶ 24, , 1070-71; Stewart v. State, , ¶ 34, , 515.

¶130 Third, Appellant fails to show Strickland prejudice based on counsel's failure to object to the prosecutorial misconduct claims we denied relief for in Proposition IX. Calvert v. State, , ¶ 22, , 985.

¶131 Fourth, Appellant complains that trial counsel was ineffective for failing to seek admission during the penalty phase of an audio recording of his first hospital interview with police. Appellant says that he can be heard becoming emotional on the recording after being told for the first time that Officer Terney was dead. Appellant claims this recording arguably put him in a better light than Deputy Columbus's bodycam video which showed him sitting on the toilet while saying he was sorry. This claim depends upon non-record evidence, specifically, a DVD of the audio recording of his police interview. Appellant has attached the DVD to his application for evidentiary hearing filed simultaneously with his brief-in-chief. We therefore apply the Rule 3.11(B) standard for an evidentiary hearing in reviewing this ineffectiveness claim. Rule 3.11(B)(3)(b)(i), Rules of the Oklahoma Court of Criminal Appeals, Title 22, Ch. 18, App. (2023); Mahdavi, , ¶¶ 46-47, 478 P.3d at 460.

¶132 Upon review of the audio recording, we find that Appellant fails to show by clear and convincing evidence there is a strong possibility trial counsel was ineffective for failing to utilize or identify the complained-of evidence. The recording of Appellant's first interview with police at the hospital does reveal that he became somewhat emotional after being told of Officer Terney's passing. However, the defense presented testimony in its case in chief from Investigator Holasek that Appellant expressed remorse to him during the interview by saying two or three times to the officers "I'm sorry" and also "fellas, I hope you believe that." Holasek also testified that he ended the interview because Appellant seemed emotional. Holasek too clarified on cross-examination that Appellant never said during the interview that he was sorry for murdering Officer Terney; never said that he was sorry for shooting the victim; and never said what he was sorry for.

¶133 Based on the total circumstances presented here, Appellant fails to show a reasonable probability of a different outcome during the penalty phase had defense counsel attempted to offer the audio recording of Appellant's police interview. The jury already was aware of Appellant's purported expressions of remorse during the police interview from Investigator Holasek's testimony. And the jury also saw police bodycam videos of his purported expressions of remorse made in the back of the ambulance shortly after the shooting and later while sitting on a toilet at the hospital. As the testimony and the videos revealed, the sincerity of Appellant's expressions of emotion during the interview was questionable because Appellant never said he was sorry for killing Officer Terney. All things considered, Appellant is not entitled to an evidentiary hearing on this claim and relief is denied.

¶134 Fifth, Appellant complains that trial counsel was ineffective for failing to present photographs showing Appellant during childhood, along with other photographs showing Appellant with his daughters Aubrey Dawn and Alexis as well as his son, Byron Jr. The photographs were not made part of the record on appeal and are included as exhibits to Appellant's Rule 3.11 application. Appellant presents four photographs depicting him as a child: one photograph shows him as an infant in his mother's arms, two are individual school photographs taken when he was six and seven years old, and a fourth photo shows Appellant posing in his high school football uniform. Appellant also offers twelve other photographs depicting him at home with three of his children, some during what appear to be family events.

¶135 Upon review of the photographs, we find that Appellant fails to show by clear and convincing evidence there is a strong possibility trial counsel was ineffective for failing to utilize or identify the complained-of evidence. Rule 3.11(B)(3)(b)(i), Rules of the Oklahoma Court of Criminal Appeals, Title 22, Ch. 18, App. (2023); Mahdavi, , ¶¶ 46-47, 478 P.3d at 460. The photographs would not have altered the evidentiary calculus in this case and overcome the strong evidence presented by the State in support of four separate aggravating circumstances, discussed in Proposition IX. The photographs also would have added very little to the defense mitigation evidence that was introduced at trial. As discussed in Proposition IX, the jury was presented during the penalty phase with a plethora of mitigation testimony from friends, family members and expert witnesses discussing virtually every aspect of Appellant's life including his relationship with his children. This included testimony from Pam Dodson, Appellant's biological mother, and Breanna Shepard, Appellant's eighteen-year-old daughter, who urged the jury to spare his life.

¶136 The photographs too must be judged against the broader penalty-phase evidence showing Appellant was a poor example of a father who viciously attacked women. The record shows Appellant had only sporadic involvement with his children due to drug use. One of Appellant's daughters, Aubry, was taken into DHS custody and adopted out to a non-parent. The State's evidence also showed that Appellant inflicted domestic violence against two of the mothers of his children, resulting in the breakup of those relationships. In one instance, Appellant kicked Brandy Armstrong, his estranged wife, down the stairs in front of their trailer house, while Armstrong was holding their infant son. Based on the total circumstances, inclusion of the photographs as part of the defense case-in-chief would not have resulted in a sentence less than death for Appellant. This evidence also could have backfired against the defense because of Appellant's history of domestic violence and his failure as a parent. Relief is denied for this claim.

¶137 Finally, Appellant complains that trial counsel was ineffective for failing to present testimony from a mitigation specialist during the penalty phase. The problem with this claim is that Appellant does not tell us what a mitigation specialist would testify to at trial. Lott v. State, , ¶ 136, , 351 (an appellant must present evidence, not speculation, second guesses or innuendo in order to meet the clear and convincing evidence standard for a hearing under Rule 3.11); Stemple, , ¶ 61, 994 P.2d at 73 (denying ineffective assistance of counsel claim where appellant failed to show what witness's testimony would be). Further, Appellant presented two well-qualified experts during the penalty phase to testify concerning Appellant's mental health issues and childhood trauma. Dr. McGarrahan and Dr. Gomez were retained by trial counsel and collectively provided an entire day's worth of testimony on these subjects. This in addition to mitigation testimony from numerous friends and family members concerning virtually every aspect of Appellant's life. Appellant fails to show deficient performance or prejudice with this claim for failing to present testimony from an unnamed mitigation expert. Proposition XI is denied. And, the application for evidentiary hearing is DENIED.

10. Constitutionality of Aggravating Circumstances

¶138 In Proposition XII, Appellant challenges the constitutionality of the avoid arrest or prosecution and the continuing threat aggravators. Appellant complains that these aggravators are unconstitutionally vague and fail to perform the necessary narrowing function. We have rejected these claims in the past. E.g., Nolen v. State, , ¶ 125, , 859 (continuing threat aggravating circumstance is constitutional); Bosse v. State, , ¶ 72, , 859-60 (avoid arrest or prosecution aggravator is constitutional). Appellant offers nothing in his current argument to cause us to question the validity of those previous holdings. Proposition XII is denied.

11. Cumulative Error

¶139 In Proposition XIII, Appellant claims that relief is warranted for cumulative error. In the present case, we assumed deficient performance by counsel based on the theory of defense presented during the guilt stage of trial but found that Appellant could not show Strickland prejudice (Proposition I). We found error based on the erroneous range of punishment listed in Instruction No. 34 for the crime of possession of controlled dangerous substances (Proposition VI). We also found insufficient evidence was presented to support Appellant's conviction in Count 2 for knowingly concealing stolen property (Proposition VII). Finally, we found error from the prosecutor's statement calling Appellant a coward (Proposition IX).

¶140 The cumulative effect of these errors does not warrant relief. As mentioned earlier, we determined that trial counsel was not constitutionally ineffective because Appellant was not prejudiced by the theory of defense presented during the first stage of trial. We cured the error with Instruction No. 34 by modifying Appellant's Count 3 sentence to the maximum allowed under the governing sentencing provision. We also cured the sufficiency of the evidence issue by reversing and remanding Count 2 with instructions to dismiss. And we found that the prosecutor's error in calling Appellant a coward did not deprive Appellant of a fundamentally fair trial in violation of due process.

¶141 The cumulative effect of the errors found in this case did not deprive Appellant of a fundamentally fair trial in violation of due process. This simply is not a case where numerous irregularities during Appellant's trial tended to prejudice his rights or otherwise deny Appellant a fair trial. See Martinez v. State, , ¶ 85, , 1119 (reciting cumulative error standard). Under the total circumstances presented here, Proposition XIII is denied.

MANDATORY SENTENCE REVIEW

¶142 This Court must determine in every capital case: (1) whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor; and (2) whether the evidence supports the jury's finding of the statutory aggravating circumstances. (C).

¶143 Having reviewed the record in this case, we find that Appellant's death sentence was not the result of trial error or improper evidence or witness testimony and that the death sentence was not imposed under the influence of passion, prejudice or any other arbitrary factor.

¶144 The jury's findings that (1) Appellant, prior to the murder, was convicted of a felony involving the use or threat of violence to the person; 2) the murder was committed for the purpose of avoiding or preventing a lawful arrest or prosecution; 3) the victim of the murder was a peace officer or guard of an institution under the control of the Department of Corrections, and such person was killed in performance of official duty; and 4) at the present time there exists a probability that Appellant will commit criminal acts of violence that would constitute a continuing threat to society were amply supported by the evidence. See (1),(5),(7),(8).

¶145 Weighing the aggravating circumstances and evidence against the mitigating evidence presented, we find, as did the jury below, that the aggravating circumstances in this case outweigh the mitigating circumstances. The jury had a substantial basis upon which to find that the aggravating circumstances outweighed the mitigating evidence and supported the death penalty in this case. The sentence of death in this case is factually substantiated and appropriate.

DECISION

¶146 The Judgment and Sentence of the District Court on Count 1 is AFFIRMED. The Judgment and Sentence of the District Court on Count 2 only is REVERSED AND REMANDED WITH INSTRUCTIONS TO DISMISS. The Judgment and Sentence of the District Court on Count 3 is AFFIRMED except the sentence is MODIFIED to five years imprisonment and a $5,000.00 fine. Appellant's application for evidentiary hearing on Sixth Amendment claim is DENIED. Pursuant to Rule 3.15, Rules of the Oklahoma Court of Criminal Appeals, Title 22, Ch. 18, App. (2023), the MANDATE is ORDERED issued upon delivery and filing of this decision.

AN APPEAL FROM
THE DISTRICT COURT OF POTTAWATOMIE COUNTY
THE HONORABLE JOHN G. CANAVAN, JR., DISTRICT JUDGE

 

 
 
 
 APPEARANCES AT TRIAL
 
 SHEA SMITH
 RAVEN SEALY
 OKLAHOMA INDIGENT
 DEFENSE SYSTEM
 CAPITAL TRIAL DIVISION
 P.O. BOX 926
 NORMAN, OK 73070
 COUNSEL FOR DEFENDANT
 
 
 APPEARANCES ON APPEAL
 
 JACQUELINE H. CHAFFIN
 OKLAHOMA INDIGENT
 DEFENSE SYSTEM
 HOMICIDE DIRECT APPEALS DIVISION
 P.O. BOX 926
 NORMAN, OK 73070
 COUNSEL FOR APPELLANT
  
 
 
 
 
 GREG MASHBURN
 DISTRICT ATTORNEY
 TRAVIS WHITE
 PATRICIA HIGH
 ASST. DISTRICT ATTORNEYS
 CLEVELAND COUNTY
 201 SOUTH JONES, SUITE 300
 NORMAN, OK 73069
 COUNSEL FOR THE STATE
 
 
 JOHN M. O'CONNOR
 ATTORNEY GENERAL OF
 OKLAHOMA
 TESSA L. HENRY
 JENNIFER L. CRABB
 ASST. ATTORNEYS GENERAL
 313 N.E. 21ST STREET
 OKLAHOMA CITY, OK 73105
 COUNSEL FOR APPELLEE
 
 
 

OPINION BY: HUDSON, V.P.J.
ROWLAND, P.J.: CONCUR 
LUMPKIN, J.: CONCUR
LEWIS, J.: CONCUR 
MUSSEMAN, J.: CONCUR

FOOTNOTES

 See . The State dismissed a fifth aggravator--that the defendant knowingly created a great risk of death to more than one person--prior to commencement of the penalty phase.

 The record shows James Bishop is the name of Appellant's grandfather. Appellant's actual date of birth is July 17, 1981--not July 17, 1979 as he told Officer Terney.

 The State's evidence shows that the effectiveness of a taser correlates to the distance between the probes when they attach to the body. The closer the probes attach on a subject's body, the less effective they are in causing incapacitation because the electrical currents delivered by the taser affect fewer muscle groups. Officer Trevour Story responded to the scene just minutes after the shootout and, in checking Appellant for weapons, observed the taser probes still attached to Appellant's buttock. Although he could not give an exact distance, Officer Story testified the taser probes were not located far enough apart on Appellant's body to be incapacitating. Officer Story opined, based on his training and experience, that the taser probes were anchored far enough apart on Appellant's buttock to be painful, and to cause cramping, but not to keep a person from moving. Lt. Mallinson similarly testified that, in his opinion, the taser deployment was not effective.

 Dr. Pfeiffer did not conduct the autopsy in this case. Dr. Clay Nichols, a pathologist with the state medical examiner's office, conducted the autopsy of Justin Terney and generated a written report. Sometime before Appellant's trial, Dr. Nichols suffered a massive stroke, leaving him one hundred percent debilitated and unavailable to testify. Dr. Pfeiffer testified at trial as a substitute witness concerning the cause and manner of the victim's death. Dr. Pfeiffer examined archive data from his agency's file for the victim's death which included the autopsy photographs, toxicology report and investigator narrative. Dr. Pfeiffer clarified in his testimony that he did not base his opinions on Dr. Nichols's autopsy report.

 Officer Shawn Crowley similarly testified that, during his twenty-four-year career, he had never carried his semiautomatic pistol without it being chamber loaded.

 Lt. Mallinson admitted on cross-examination that he did not inspect the victim's gun that night before starting the shift. Defense counsel had Investigator Jason Holasek demonstrate for the jury the sounds made when Officer Terney's taser was unholstered and re-holstered on his duty belt. Defense counsel also had Lt. Mallinson demonstrate the sounds made when he unholstered and re-holstered his gun and taser. Based on this evidence, defense counsel argued that the metallic clicking noise heard on the dashcam recording was the sound of Officer Terney re-holstering his taser--not Appellant loading a round in the chamber of the murder weapon.

 Dr. Nichols's last name is spelled "Nickels" in the portion of the transcript reporting Dr. Pfeiffer's testimony. The portion of the transcript reporting the closing arguments, however, was prepared by a different court reporter and spells the name as "Nichols." Review of the certified autopsy report in this case, which was admitted as an exhibit at Appellant's preliminary hearing, confirms the correct spelling is Nichols.

 To the extent Appellant complains that trial counsel's flawed defense theory resulted in the trial court declining to instruct on lesser included offenses, this aspect of his Proposition I claim also lacks merit. As discussed in Propositions II, III and IV, infra, insufficient prima facie evidence was presented at trial to support the requested lesser included offenses. Because the record evidence did not support instruction on these lesser included crimes, Appellant cannot show Strickland prejudice with this argument.

 This includes an affidavit and report from Tom Bevel, a crime scene reconstruction expert retained by trial and appellate counsel to review the case. See Application for Evidentiary Hearing on Sixth Amendment Claim, filed with this Court by Appellant on September 17, 2021. In his affidavit, Bevel states that he told defense counsel before trial that the possibility of Officer Terney shooting himself in the right thigh could not be conclusively ruled out but was improbable. In a report prepared for appellate counsel, Bevel similarly wrote that Officer Terney shooting himself cannot be ruled out as it is possible but that, in Bevel's opinion, it is improbable. Bevel also concluded in his report that there is no physical evidence to support the conclusion that Appellant shot himself. In reaching these conclusions on appeal, Bevel considered, inter alia, the testimony of Dr. Pfeiffer and information from Dr. Nichols's autopsy report. Bevel also noted in his report the metallic clicking sound heard on the dashcam recording seconds before the gunfire, describing it as a "sound like chambering a round into [the] chamber" of a gun.

 With this disposition, we need not address the State's argument that there was an insufficient nexus between the underlying felony and the murder of Officer Terney. See Malaske v. State, , ¶¶ 4-6, , 1117-18; Wade v. State, , ¶¶ 3-4, , 916.

 421 U.S. 794 (1975).

 Notably, only two conventional news articles are contained in the record for our review. These articles were attached to Appellant's pretrial Application for Change of Venue. While Appellant attached a list of links to articles in his Application for Evidentiary Hearing on Sixth Amendment Claim, Appellant did not raise an ineffective assistance of counsel claim related to these links in his brief. This Court thus cannot consider this extra-record evidence. Rule 3.11(B)(3)(b), Rules of the Oklahoma Court of Criminal Appeals, Title 22, Ch. 18, App. (2023). See also Garrison v. State, , ¶ 131 n.36, , 612 n.36.

 The voir dire process that followed was divided into two phases. The entire venire panel was initially provided with the OUJI-CR (2d) 1-10 juror questionnaire when they checked in for jury service on the first day. Potential jurors were then randomly divided into panels of fourteen or fifteen individuals. The first stage of voir dire began the next day. During this stage, each panel was questioned separately, over the course of four days, on the issues of pretrial publicity and death qualification. The first stage concluded once seventy potential jurors had been passed for cause on these specific issues. At that point, the remainder of the jury panel was released, and the second stage of voir dire commenced. The second stage consisted of a general inquiry of the remaining venire panel, beginning with thirty individuals randomly selected from the group of seventy. Twelve jurors and three alternates were ultimately selected.

 At the conclusion of the second phase of voir dire, defense counsel announced that it could not pass the panel for cause. Counsel cited two reasons: (1) the denial of some of Appellant's for-cause challenges based on "death penalty questions" during the first stage of voir dire; and (2) the denial of some of Appellant's for-cause challenges made that day during the second-stage general inquiry. Pretrial publicity was not mentioned. Additionally, although Appellant requested eight additional peremptory challenges, the record shows his request was not based on pretrial publicity concerns. Appellant asserted that he had unsuccessfully challenged for cause the first eight jurors he struck; however, the record shows Appellant only challenged seven of the nine jurors struck--B.N., D.N., K.J., M.L., B.N.B., B.D.B., and A.S. Appellant challenged D.N., B.N.B., and B.D.B. each during the first stage of voir dire due to death qualification concerns. Appellant challenged B.N., K.J., M.L., and A.S. each during the second-stage general inquiry for non-publicity reasons.

 The State's penalty-phase evidence showed that Appellant was convicted in Okfuskee County District Court, Case No. CF-2011-54, of assault and battery with a dangerous weapon for beating Christopher Buxton with either a metal pipe or aluminum bat. The facts surrounding this attack were presented as part of the State's penalty phase evidence.

 These aggravating circumstances were established at trial primarily through the first stage evidence. During the penalty phase, additional evidence was presented in support of both these aggravating circumstances. The State introduced Officer Terney's CLEET records confirming his certification as a peace officer at the time of his murder. Further, Pamela Dodson, Appellant's mother, testified on cross-examination during the penalty phase that she spoke with Appellant the morning of the murder, on March 26, 2017. Dodson knew that law enforcement officers in Okfuskee County were attempting to apprehend Appellant. Dodson asked Appellant to surrender to authorities. Appellant dismissed this request and said "Mama, I'm not going back to jail."

 Appellant was convicted of the misdemeanor crime of Reckless Handling of a Firearm in Hughes County District Court, Case No. CF-2007-68, for his actions towards Sanders.